**UNITED STATES of America, Appellee,**

v.

**Alan SINGER, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**John RENICK, Appellant.**

**Nos. 83–1625, 83–1626.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1983.

Decided April 18, 1984.

Thomas E. Dittmeier, U.S. Atty., St. Louis, Mo., Larry D. Hale, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Silverglate, Gertner, Baker & Fine, Jeanne Baker, David Kelston, Boston, Mass., Kaveney, Fleming, Russell, Beach & Mittleman, Lawrence J. Fleming, St. Louis, Mo., for appellant Singer.

Before JOHN R. GIBSON and FAGG, Circuit Judges, and HUNTER,[*] Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

A pound of cocaine hidden behind the rear seat of a Buick Skylark with Michigan license plates led to the conviction of Alan Singer and John Renick of charges of possessing with intent to distribute, and conspiring to distribute, the cocaine in violation of 21 U.S.C. §§ 841(a) and 846 (1976). On appeal, Singer argues that the district court[1] erred in denying his motion to sever his trial from Renick's and in admitting into evidence certain hearsay statements. Renick argues that his consent to search the automobile in which he was arrested was involuntary, and therefore the cocaine subsequently discovered should have been suppressed. Both argue that the United States Attorney indirectly commented during closing argument on their failure to testify, thereby violating their fifth amendment privilege. We affirm.

The story of the case against Renick and Singer begins with the arrest of Patrick

---

[*] The Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri, sitting by designation.

1. The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

O'Dea and his subsequent agreement to act as informant. In fulfilling that role, O'Dea attempted to arrange drug purchases from a number of individuals with whom he had previously done business, including John Renick. O'Dea and Renick had a number of telephone conversations between December 20, 1982, and January 16, 1983. Several of these conversations were recorded and played for the jury. O'Dea testified to the substance of others. Their conversations reveal the following events leading up to the arrest of Renick and Singer.

Prior to January 12, 1983, a number of calls were placed between Renick and O'Dea to arrange for the sale of a pound of cocaine. On January 12, Renick called O'Dea and told him he was preparing to leave Florida. On January 14, Renick again called and stated that he was six hundred miles away and was preparing to begin the trip to St. Louis. Renick also told him that "it was snowing quite a bit" and that "he had the accountant with him." O'Dea testified that he understood "the accountant" to refer to Singer. O'Dea contacted Renick upon his arrival in St. Louis, and the two made plans to meet at the St. Louis riverfront.

O'Dea was wired with a "Kel" transmitter for the riverfront meeting. At the meeting, O'Dea recognized the person with Renick as Singer. O'Dea insisted on getting a sample of the drugs immediately, but Renick wanted to wait until they went to O'Dea's house where he could continue watching a football game. O'Dea, objecting to this delay, testified that Singer's response was "its the only way it can be done" and that "we really can't get it out now" because "its hidden deep in the car." The three thus got into their cars to go to O'Dea's house. Renick and Singer were arrested as they drove away from the riverfront.

After reading Renick and Singer their rights and obtaining their consent to search the car, the police discovered behind the rear seat a package later identified as approximately one pound of cocaine. Renick and Singer were then brought to the St. Louis office of the Drug Enforcement Administration for processing. In response to a routine question concerning his occupation, Singer stated that he was a "self-employed accountant." At the same time, the arresting officers approached Renick and proposed that he consider cooperating with them in future investigations. Renick responded with the following statement:

Bob, I been doing this all my life, I still haven't got anything to show for it. I'm caught again. It must be my fate. I'm ready to take what I've got coming.

After the adverse jury verdict, Singer was sentenced to concurrent six-year terms with a three-year parole term. Renick was sentenced to concurrent eight-year terms with a three-year parole term.

### I. *Severance*

Singer first argues that the district court erred in refusing to sever his trial from Renick's. He argues that he was prejudiced by the unusually inflammatory nature of the tape-recorded telephone conversations in which Renick and O'Dea planned the transaction, the abundant evidence of past crimes and other bad acts committed by Renick, and Renick's incriminating post-arrest statement. In contrast, Singer argues that the evidence against him was weak, although he admits that it was legally sufficient for jury submission. He asserts, however, that "it fell far short of the overwhelming quantity and quality of evidence [necessary] to find that a failure to sever did not prejudice his right to a fair trial." Appellant's Brief at 25.

■■ The general rule is that "persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." *United States v. Jackson*, 549 F.2d 517, 523 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). The trial court's denial of a severance motion will not be disturbed on appeal absent an abuse of discretion and clear prejudice to the defendant's right to a fair trial. *United States v. Bohr*, 581 F.2d 1294, 1299, 1300–01 (8th Cir.), *cert. denied*, 439 U.S. 958, 99

S.Ct. 361, 58 L.Ed.2d 351 (1978). Clear prejudice, however, is more than simply a better chance of acquittal at a separate trial. *Id.* at 1301. "[T]here must be some appreciable chance that [the] defendant[ ] would not have been convicted had the separate trial been granted." *United States v. Bostic,* 713 F.2d 401, 403 (8th Cir.1983).

■ The essence of Singer's argument is that he was clearly prejudiced by a joint trial due to the disparity in evidence introduced against each of the two defendants. Standing alone, this is insufficient grounds for severance. *United States v. Kaminski,* 692 F.2d 505, 520 (8th Cir.1982); *Jackson,* 549 F.2d at 525. In such cases, severance will be granted only if the jury is unable to "compartmentalize the evidence as it relates to separate defendants." *Jackson,* 549 F.2d at 525. The district court is given wide discretion in making this determination. *United States v. King,* 567 F.2d 785, 788 (8th Cir.1977).

It is true that the evidence against Renick was of a strong and incriminating nature. We cannot conclude, however, that the jury was unable to distinguish the evidence against Singer from that applicable only to Renick. The trial judge gave limiting instructions on the evidence of the telephone calls between O'Dea and Renick that did not contain any reference to "the accountant." Renick's discussion of his prior business deals and his post-arrest statement were clearly attributable to him and in no way implicated Singer. Any prejudicial effect to Singer from evidence of O'Dea's criminal activities resulted primarily from the extensive cross-examination of O'Dea by Singer's counsel. Our review of the record convinces us that the jury could properly compartmentalize the evidence against the two defendants.

■ Singer also asserts that the evidence against Renick, if not clearly prejudicial in its own right, became so when contrasted with the weakness of the government's case against him. We are convinced that Singer views the evidence against him too optimistically. The evidence shows that Renick told O'Dea that "he had the accountant with him," a person O'Dea understood and later recognized to be Singer. Singer subsequently told a DEA agent that he was self-employed as an accountant. O'Dea's testimony established that, at the riverfront meeting, Singer participated in the conversations concerning the necessity of completing the transaction at O'Dea's house. He testified that Singer said "it's the only way it can be done" and, when O'Dea persisted in asking for a sample, by stating "we really can't get it out now" because "it's hidden deep in the car." A search of the car in which Singer and Renick were traveling revealed the cocaine and a Hertz rental agreement bearing a credit card imprint with the name of Alan Singer. In light of this strong evidence against Singer, we do not believe there was an "appreciable chance" that he would not have been convicted had he been granted a separate trial.

## II. *Hearsay*

Singer next argues that hearsay statements were improperly received into evidence against him. Specifically, he points to two statements made by Renick to O'Dea during unrecorded telephone conversations. The first is Renick's January 14 statement that "he had the accountant with him." The second is Renick's January 15 statement that "they had been driving all day" and "they were in town." Singer claims that these statements are not admissible as the declarations of a coconspirator under Fed.R.Evid. 801(d)(2)(E) because there existed no independent evidence that Singer was conspiring with Renick on January 14 or 15.

■ An out-of-court declaration of a co-conspirator is admissible against a defendant if (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the declaration was made during the course and in furtherance of the conspiracy. *United States v. Bell,* 573 F.2d 1040, 1043 (8th Cir.1978); Fed.R.Evid. 801(d)(2)(E). Where the de-

fendant asserts that no conspiracy existed at the time the challenged statements were made, the government must show by a "preponderance of independent evidence" that a conspiracy existed. *United States v. Piatt,* 679 F.2d 1228, 1232 (8th Cir.1982). This standard provides that a co-conspirator's statements are admissible "if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course . . . of an illegal association to which the declarant and the defendant were parties." *Bell,* 573 F.2d at 1044. While the evidence must be independent, *i.e.,* exclusive of the challenged statements, *United States v. Baykowski,* 615 F.2d 767, 771 n. 3 (8th Cir.1980), it may be circumstantial, *United States v. Jankowski,* 713 F.2d 394, 396 (8th Cir.1983). The district court's determination will not be reversed unless clearly erroneous. *United States v. Harshaw,* 705 F.2d 317, 320 (8th Cir.1983).

Following the procedure outlined in *Bell, supra,* the district court admitted Renick's statements conditionally. At the conclusion of the evidence, it ruled that the statements were admissible, satisfied that "[o]n independent evidence . . . it is more likely than not that the statements were made during the course and in furtherance of a conspiracy, to which the declarants, who are defendants in this case, were parties."

It is without dispute that Singer's presence at the riverfront meeting and his statements referring to the cocaine and the method of concluding the transaction indicate he was conspiring with Renick as of January 16. The issue is whether the district court was clearly erroneous in its conclusion that a preponderance of the evidence indicated that the conspiracy existed two days earlier on January 14. The evidence shows that Singer was arrested with Renick in a Buick Skylark. A Hertz rental agreement dated January 14 was found in the glove compartment. While Singer correctly asserts that the signature "Alan J. Singer" written on the agreement was not verified at trial, the agreement has the imprint of a credit card belonging to Alan J. Singer. The agreement also bears nota-

tions concerning the details of a driver's license and shows that additional identification in the form of an Eastern Ionosphere Card was presented to the leasing agent. Furthermore, the envelope containing the agreement indicates a reservation in the name of Singer. Finally, the agreement, executed in Detroit, lists the vehicle leased as a Buick Skylark with Michigan plates. Surveilling officers spotted Renick and Singer in a car matching this description two days later on the morning of January 16 in St. Louis.

 The district court in admitting Renick's statements did not specifically catalog the above evidence. However, the Hertz agreement is evidence that Singer was in Detroit on January 14. He was arrested two days later in St. Louis with the cocaine in a car matching the description of that leased in his name in Detroit. The district court could also properly consider the time needed to drive from Detroit to St. Louis. In light of this evidence, we cannot conclude that the district court was clearly erroneous in its finding that Renick and Singer were conspiring as of January 14, the date on which the car was leased.

Singer cites *United States v. Holder,* 560 F.2d 953 (8th Cir.1977), and *United States v. Frol,* 518 F.2d 1134 (8th Cir.1975), in support of his claim that the independent evidence was insufficient to implicate him in a conspiracy as of January 14. These two cases do not lend support to Singer's position. As we stated in *Harshaw:*

> Many of the cited cases [including *Holder* and *Frol*] which found no conspiracy state that mere presence of a defendant at the scene of the crime or mere association with members of a criminal conspiracy is not sufficient to prove a conspiracy. In all but one of the cited cases that found a conspiracy there was proof beyond mere presence at a series of meetings before the drug sale. *Often the additional proof is that the defendant was arrested with marked money or drugs.*

705 F.2d at 321 (emphasis added). In this case, Singer was arrested with the pound of cocaine. Furthermore, the evidence linked him to the car containing the drugs as of January 14. Singer thus cannot claim that the evidence establishes only his mere presence at the crime scene or mere association with its perpetrator, and therefore our decisions in *Holder* and *Frol, supra,* are inapplicable.

### III. *Prosecutorial Comment*

Both Renick and Singer argue that the United States Attorney impermissibly commented on their failure to testify by stating that O'Dea's testimony was "uncontradicted," thereby violating their fifth amendment right against self-incrimination. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The challenged portions of the United States Attorney's closing argument are as follows:

> Now, ladies and gentlemen, I suspect—I'm going to sit down here in a minute and counsel are going to then get up, and I suspect, ladies and gentlemen, that they are going to maintain that Pat O'Dea's a liar. And I want to point out something to you before they do. I want to point out to you folks the fact that you heard yourself, what does Pat O'Dea have to gain from lying? He's cooperating. He has nothing to gain from lying. *Beyond that, ladies and gentlemen, there is not the slightest inkling of evidence that you heard that contradicts a word Pat O'Dea stated, not one, ladies and gentlemen.* And your verdict in this case and any other case you ever served on must be based upon the evidence. *There is nothing to base your verdict on.*
>
> Be mindful, then, ladies and gentlemen, when the character and the credibility of Mr. O'Dea is being assaulted, be mindful of the fact, ladies and gentlemen, *there is nothing to contradict it here.* (emphasis added).

The motions of both defendants for a mistrial were denied, but neither requested a curative instruction on this argument.

While describing the evidence as uncontradicted may be proper in some circumstances, *United States v. Thurmond,* 541 F.2d 774, 776 (8th Cir.1976), *cert. denied,* 430 U.S. 933, 97 S.Ct. 1556, 51 L.Ed.2d 778 (1977); *Morrison v. United States,* 6 F.2d 809, 811 (8th Cir.1925), we have noted that such descriptions "carr[y] a strong connotation that somehow the defendant himself has failed to rebut a particular point of evidence, and thus brings a prosecutor perilously close to invading the defendant's right of silence...." *United States v. Sanders,* 547 F.2d 1037, 1042 (8th Cir.1976), *cert. denied,* 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977). The test to be applied is whether "the comment must have been clearly intended or be of such a nature that the jury would naturally and necessarily view the comment as a reference to the defendant's failure to testify." *United States v. Williams,* 503 F.2d 480, 485 (8th Cir.1974). A prosecutor's description of the evidence as "uncontradicted" may "naturally and necessarily" be viewed as a reference to the defendant's silence when the defendant is the only person that could be expected to challenge the government's evidence. *Weddell v. Meierhenry,* 636 F.2d 211 (8th Cir.1980), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981). Even in such cases, however, comments clearly referring to the strength of the evidence or the failure of the defense to rebut the government's case may be permissible. *Thurmond,* 541 F.2d at 776.

The critical question is whether the jurors believed that only Singer and Renick could refute O'Dea's testimony, and thus "naturally and necessarily" viewed the comment as a reference to their silence. This question can best be approached separately as to Singer and Renick.

As to Singer, O'Dea testified that, at the riverfront meeting, Singer stated that a sample of the cocaine could not be readily obtained because "we really can't get it out now," that it was "hidden deep in the car," and that going to O'Dea's house

was "the only way it could be done." Police Officer Peter Gober was monitoring this conversation by means of the transmitter taped to O'Dea's chest. Although technical difficulties made much of the conversation unintelligible, Gober did testify that he could recognize three distinct voices and that he could distinguish O'Dea's voice from that of the two defendants. He testified that he heard one defendant say "it's in the car" and the other say "it's the only way it can be done." He also testified that one of the defendants inquired as to whether O'Dea had a television in his house. Finally, Gober stated that one of the defendants indicated that "[w]e don't know our way around the County, we're going to have to follow you back to your house." The testimony of Gober thus generally corroborated O'Dea's version of the events at the riverfront and specifically confirmed O'Dea's testimony as to certain of the statements made by Singer. It reveals that the case against Singer was not based solely on O'Dea's testimony. In light of this, we cannot conclude that the jury "naturally and necessarily" believed that the comment was a reference to Singer's silence. It is equally likely that the jury viewed the comment as a reference to the weight of the evidence against him. The United States Attorney's description of O'Dea's testimony as "uncontradicted" was therefore not an improper comment on Singer's right to remain silent.

With respect to Renick, O'Dea's testimony concerning his participation in the riverfront meeting was, as with Singer, corroborated by the officer who monitored the conversation. O'Dea also testified as to the content of his unrecorded phone conversations with Renick, and the jury heard the tapes of the recorded phone conversations between the two. The content of the recorded calls was, if anything, more in-

criminating than O'Dea's testimony concerning those not recorded. This leads us to believe that the corroborating evidence of the tapes prevented the jury from "naturally and necessarily" viewing the comment as a reference to Renick's silence, even though only Renick could dispute the evidence of the unrecorded calls. We conclude that, in Renick's case, it is even more likely that the jury viewed the comment as a reference to the weight of the evidence against him. Renick's right to remain silent was not improperly commented upon.

■■■ Furthermore, we believe that the comment made by the United States Attorney, even if improper, was without prejudice. In Singer's case, he actively participated in the riverfront meeting, was arrested with the cocaine, and was linked to the automobile on January 14. In regard to Renick, additional incriminating evidence of his phone conversations with O'Dea and his post-arrest statement was introduced. In both cases, we think it clear beyond a reasonable doubt that the jury would have returned a guilty verdict absent the description of O'Dea's testimony as "uncontradicted."[2] *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 1980, 76 L.Ed. 2d 96, 106 (1983); *Sanders,* 547 F.2d at 1042.

## IV.

■■■ Renick further argues that his consent to search the automobile was involuntary and therefore in violation of the fourth amendment. A warrantless search without probable cause is valid if voluntary consent is given. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Frazier,* 560 F.2d 884 (8th Cir.1977), *cert. de-*

**2.** Renick further argues that the United States Attorney's comment was also reversible error under 18 U.S.C. § 3481 (1976) and that a new trial is required because any application of the harmless error rule to that statute would amount to "legislative revisionism in violation of the doctrine of separation of powers." Appellant's Brief at 27. In determining whether pros-

ecutorial comment constitutes an impermissible reference to the defendant's failure to testify, the same "naturally and necessarily" standard outlined above applies to both the fifth amendment and 18 U.S.C. § 3481. *United States v. Williams,* 521 F.2d 950, 952–53 (D.C.Cir.1975). As demonstrated above, that standard was not met in this case.

*nied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). The voluntariness of the consent given is determined by examining the totality of the circumstances. *Mendenhall,* 446 U.S. at 557, 100 S.Ct. at 1878. The arresting officers testified that Renick was stopped by five or six officers, advised of his rights and asked if the vehicle could be searched. He replied without hesitation that the officers could proceed. Under these circumstances, we find no evidence that Renick's consent was "the result of duress or coercion, express or implied," and was therefore voluntary. *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2059.

Having carefully considered all of the arguments advanced by Renick and Singer, we conclude that their convictions must be affirmed.